**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| MICHAEL FORREST, individually and as a representative of a class of participants and beneficiaries on behalf of the United Rentals 401(k) Investment Plan, | Civil Action No. 3:26-cv-________ |
| Plaintiff, | CLASS ACTION |
| v. | JURY TRIAL DEMANDED |
| UNITED RENTALS (NORTH AMERICA), INC. and THE RETIREMENT COMMITTEE OF UNITED RENTALS (NORTH AMERICA), INC., | OCTOBER 20, 2026 |
| Defendants. | |

**CLASS ACTION COMPLAINT**

1. Plaintiff, Michael Forrest, individually and as a representative of a class of participants and beneficiaries of the United Rentals 401(k) Investment Plan (hereinafter, the "Plan"), brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, against Defendants United Rentals (North America), Inc. (hereinafter, "United Rentals" or the "Company") and the Retirement Committee of United Rentals (North America), Inc. (hereinafter, the "Committee," and together with United Rentals, "Defendants") for: (1) breach of ERISA's fiduciary duties of prudence and loyalty; (2) violation of ERISA's prohibited transaction rules; and (3) failure to monitor Plan fiduciaries.

2. Defined contribution plans, like the United Rentals Plan, have become the primary form of retirement savings in the United States, and can be considered our country's de facto retirement system. The participants—not their employers—bear the risk of high fees and the underperformance of their investments. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575

U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[1]

3. To protect plan participants, ERISA imposes a high standard upon fiduciaries responsible for managing 401(k) plans. ERISA requires a fiduciary to act "solely in the interest of participants . . . for the exclusive purpose of providing benefits to participants and beneficiaries; and defraying reasonable expenses of administering the plan," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and it prohibits a fiduciary from causing a plan to engage in a transaction that constitutes the "furnishing of . . . services" between the plan and a party in interest or the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. §§ 1104(a)(1)(A), (B), (D); 1106(a)(1)(C)–(D).

4. The Second Circuit has recognized these duties as the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). They require fiduciaries to act "with an eye single to the interests of the participants and beneficiaries," *id.* at 271, and "to deal fairly and honestly with beneficiaries," *Cunningham v. Cornell Univ.*, 604 U.S. 693, 696 (2025) ("Cunningham").

5. ERISA "Section 1106 supplements [a] fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically barring certain transactions deemed 'likely to injure the pension plan.'" *Cunningham*, 604 U.S. at 697.

6. This Complaint alleges two categories of ERISA violations: (1) claims for breach of the fiduciary duty of prudence and for violation of ERISA's prohibited transaction rules, for the

---

[1] A Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/401k-plan-fees.pdf.

Committee's conduct in allowing the Plan to pay excessive and unreasonable fees to the Plan's recordkeeper, Principal Life Insurance Company (Counts I–II); and (2) claims for breach of the fiduciary duties of loyalty and prudence for Defendants' misallocation of Plan forfeitures, which are Plan assets (Counts III–IV). Count V alleges a claim against Defendant United Rentals for failure to monitor the Committee.

7. With respect to the Plan's recordkeeping services, as detailed below, the Committee allowed the Plan to pay Principal Life Insurance Company ("Principal") as much as $61 per participant per year for recordkeeping and administrative services—and never less than $55—from 2020 through 2025, when Principal itself was providing the identical package of services, reported under the identical service codes on the Forms 5500 of each plan, to comparable plans of the same size for as little as $33 per participant and, on average, for approximately $40. Year after year, the Plan paid Principal 34% to 49% more than the average of those comparable plans, and in no year did any of them pay as much as the Plan. Principal charged one very large plan approximately $8 per participant for the same services. Principal's own pricing shows that the fee was negotiable; the Committee never negotiated it, and the Plan's fee did not fall even as the Plan grew by more than 40%. Plan participants paid millions of dollars in excessive and unreasonable recordkeeping fees as a result.

8. As of December 31, 2025, the Plan had 27,059 participants with account balances and assets of over $2.64 billion, placing it in the top 0.05% of all defined contribution plans by number of participants. Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services fees within the marketplace for administration of defined contribution plans. The marketplace for defined contribution retirement plan services is well-established and is

competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

9. With respect to Plan forfeitures, as detailed below, instead of prudently and loyally evaluating how to best deploy Plan assets that had been forfeited by departing Plan participants, Defendants instead reflexively and exclusively used those forfeitures to benefit United Rentals, to the detriment of the Plan and its participants, by applying "substantially all" of more than $14.3 million of Plan forfeitures to offset United Rentals' obligation to make safe harbor matching contributions to the Plan between 2020 and 2025, while applying $0 to defray Plan expenses. Defendants' unconsidered decision to use every dollar of Plan forfeitures to benefit United Rentals resulted in Plan participants paying more than $8.68 million in Plan expenses to the Plan's third-party service providers that should have been paid with Plan forfeitures. Even more egregious, in every year of the Class Period the Plan generated more forfeitures than the entire amount of expenses charged to participants—so Defendants could have eliminated every dollar of expense borne by participants and still applied more than $5.6 million of forfeitures to reduce United Rentals' contributions.

10. United Rentals did not need the subsidy. It is the largest equipment rental company in the world; it earned between $890 million and $2.6 billion in net income in each year of the Class Period; and its safe harbor matching contribution was a fixed, per-pay-period obligation under the Plan that would have been paid in the same amount regardless of how forfeitures were used. The only effect of Defendants' choice was to shift the cost of administering the Plan from United Rentals to participants. Then, on December 30, 2024—amid a wave of litigation challenging exactly this practice—United Rentals amended the Plan, retroactive to January 1, 2024, to require that forfeitures be used to offset its contributions first.

11. To remedy these fiduciary breaches and ERISA violations, Plaintiff, individually and as representative of a class of participants and beneficiaries of the Plan, brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and prohibited transaction and to restore to the Plan any profits made through Defendants' use of the Plan's assets. In addition, Plaintiff seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate. Plaintiff, individually and as representative of a class of participants and beneficiaries of the Plan, also brings claims under 29 U.S.C. § 1132(a)(3) for appropriate equitable relief.

## JURISDICTION, VENUE, AND ERISA EXHAUSTION

12. This Court has exclusive subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 et seq.

13. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

14. Venue is appropriate in this District within the meaning of 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because the Plan is administered in this District, some or all of the violations of ERISA occurred in this District, and Defendants reside and may be found in this District. United Rentals maintains its headquarters at 100 First Stamford Place, Suite 700, Stamford, Connecticut, which is also the address of the Plan and of the Committee.

15. Plaintiff is not required to exhaust administrative remedies under the Plan or ERISA before filing this lawsuit because the claims brought by Plaintiff arise from ERISA statutory

fiduciary breaches and prohibited transactions under ERISA as to the Plan in its entirety and do not involve mismanagement of individual accounts or the denial of benefits under the terms of the Plan.

**DEMAND FOR JURY TRIAL**

16. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial on all issues so triable. *Vellali v. Yale Univ.*, 662 F. Supp. 3d 238, 242 (D. Conn. 2023) (plaintiffs bringing ERISA breach of fiduciary duty and prohibited transaction class claims "have the right to a jury trial in this case on their claims for money damages").

**PARTIES**

17. The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34) that covers eligible employees of United Rentals and its participating affiliates and is subject to the provisions of ERISA pursuant to 29 U.S.C. § 1103(a).

18. Plaintiff Michael Forrest is a citizen of the State of Washington, was employed by United Rentals, and was a participant in the Plan during the Class Period (October 15, 2020 through the date of judgment). As such, he is a participant under ERISA § 3(7), 29 U.S.C. § 1002(7).

19. During the Class Period, Plaintiff's individual account was charged, and Plaintiff paid, expenses attributable to the maintenance and administration of the Plan to the Plan's third-party service providers, including the recordkeeping fees paid to Principal Life Insurance Company. Plaintiff's statements further reflect administrative fees deducted from his account and paid to Principal.

20. Plaintiff has Article III standing to bring this action on behalf of the Plan because he suffered actual injuries through the diminishment of his individual Plan account by (1)

excessive and unreasonable recordkeeping fees and (2) administrative expenses that should have been paid for with Plan forfeitures. Had Defendants used Plan forfeitures to pay those expenses, United Rentals would have made the same safe harbor matching contributions from its own funds, Plaintiff's account would not have borne those expenses, and Plaintiff's account would have been correspondingly larger, with additional investment earnings. These injuries are fairly traceable to Defendants' unlawful conduct, and they are likely to be redressed by a favorable judgment providing relief to the Plan.

21. Having established Article III standing, Plaintiff may seek recovery for the entire Plan under 29 U.S.C. § 1132(a)(2).

22. Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the misallocation of Plan forfeitures and the knowledge of how Plan service providers and fees were selected) necessary to understand that Defendants breached their fiduciary duties and ERISA's prohibited transaction rules until shortly before this suit was filed. Having never managed a very large 401(k) plan, Plaintiff, and all participants in the Plan, lacked actual knowledge of how Plan forfeitures should be allocated by Defendants, lacked actual knowledge of how Plan forfeitures were used by Defendants, and lacked actual knowledge of the process (if any) Defendants used to select and monitor the Plan's recordkeeper and its compensation.

23. United Rentals (North America), Inc. is a Delaware corporation with its principal place of business at 100 First Stamford Place, Suite 700, Stamford, Connecticut 06902. It is a wholly owned subsidiary of United Rentals, Inc., the largest equipment rental company in the world, and is the entity through which United Rentals, Inc. conducts substantially all of its operations in the United States.

24. United Rentals, Inc. is a publicly traded company that has reported billions of dollars in revenue and income during the Class Period, including $8.53 billion in total revenues and $890 million in net income for 2020 and $15.35 billion in total revenues and $2.58 billion in net income for 2024.[2]

25. United Rentals is the Plan sponsor under 29 U.S.C. § 1002(16)(B) and, under the terms of the Plan, "the plan administrator within the meaning of Section 414(g) of the Code." Plan § 2.1.

26. The Committee is the Plan Administrator pursuant to 29 U.S.C. § 1002(16)(A), with "responsibility and authority to control the operation and administration of the Plan in accordance with the terms of the Plan and Trust Agreement." Plan § 2.2(b); SPD at 2, 48, 50. The Committee exercises discretionary authority and discretionary control respecting the management and disposition of Plan assets and discretionary authority and responsibility in the administration of the Plan, including the selection, retention, and compensation of the Plan's recordkeeper, and is responsible or liable in some manner for the conduct alleged in this Complaint.

27. United Rentals and the Committee are both "named fiduciaries" of the Plan. Plan § 2.2. United Rentals appointed the Committee; the Committee "shall be comprised of such persons who shall be appointed by and serve at the pleasure of the Company," Plan § 2.1, and its members may be "removed, without cause, by the Company," Plan § 2.8. Under ERISA, United Rentals has a duty to monitor the Committee.

---

[2] United Rentals, Inc., Annual Reports on Form 10-K for fiscal years 2020 through 2024, filed with the Securities and Exchange Commission; United Rentals, Inc., Press Release, "United Rentals Announces Record Fourth Quarter Results, Introduces 2022 Outlook and Announces New $1 Billion Share Repurchase Program" (Jan. 26, 2022); United Rentals, Inc., Press Release, "United Rentals Announces Record Fourth Quarter and Full-Year 2023 Results" (Jan. 24, 2024); United Rentals, Inc., Press Release, "United Rentals Announces Record Fourth Quarter and Full-Year 2024 Results" (Jan. 29, 2025).

28. Under the terms of the Plan in effect through December 31, 2023, discretion over the use of Plan forfeitures was vested in United Rentals itself: "Any forfeitures shall be used at the discretion of the Employer to pay administrative expenses of the Plan or to offset future Employer contributions to the Plan." Plan § 9.1(d). Because United Rentals exercised discretionary authority and control over the disposition of Plan assets when it directed how forfeitures would be used, it acted as a fiduciary under 29 U.S.C. § 1002(21)(A) with respect to those decisions. The Committee, in turn, holds the authority under the Plan to "determine the manner in which the Fund shall be disbursed," Plan § 11.1, and to determine when Employer contributions and forfeitures are allocated to participants' accounts, Plan § 5.1(a). Throughout the Class Period, the Committee exercised that authority—and its broader authority over "the operation and administration of the Plan," Plan § 2.2(b)—to control the Plan's forfeiture account and the use of Forfeited Plan Assets (defined below). In exercising authority and control over Plan assets, Defendants acted through their officers, employees, and Committee members.

29. Employers that sponsor ERISA plans wear "two hats." They act as employer and plan sponsor—a settlor—when they engage in settlor functions such as establishing, funding, amending, or terminating a plan, and they act as a fiduciary when they administer or manage the plan or exercise control over its assets. ERISA requires that "the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions." *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000).

30. United Rentals' decisions to establish the Plan, to provide the Safe Harbor Match (defined below), to set the Plan's vesting schedule, and to amend the Plan were settlor decisions. But once United Rentals' contributions were deposited into the Plan's trust and later forfeited by departing participants, those Forfeited Plan Assets were assets of the Plan held for the exclusive

benefit of participants. United Rentals' annual decision as to how those assets would be used—to relieve itself of its own contribution obligation or to pay the expenses charged to participants' accounts—was an exercise of "discretionary authority or discretionary control respecting management or disposition of [Plan] assets," 29 U.S.C. § 1002(21)(A), and therefore a fiduciary act. When United Rentals made that decision, ERISA required it to wear its fiduciary hat and to act solely in the interest of Plan participants. United Rentals is also a party in interest with respect to the Plan because it is the employer of Plan participants. 29 U.S.C. § 1002(14)(C).

**ERISA'S PURPOSE AS APPLIED TO DEFINED CONTRIBUTION PLANS**

31. A defined contribution plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeiture of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34). As such, a participant's retirement account in a defined contribution plan equals (1) the amount of the participant's voluntary contributions; plus (2) the amount of any employer contributions; plus (3) any investment returns on those contributions; minus (4) plan and investment expenses paid to third-party service providers. *Cunningham*, 604 U.S. at 697–98 (explaining that defined contribution participants "maintain individual investment accounts within those plans, the value of which is determined by the market performance of employee and employer contributions, less expenses. Those expenses include fees paid to service providers.") (quoting *Tibble*, 575 U.S. at 525).

32. A plan's fiduciaries have control over defined contribution plan expenses. The fiduciaries are responsible for hiring administrative service providers for a plan, such as a recordkeeper, and for negotiating and approving the amount of fees paid to those administrative service providers. These fiduciary decisions have the potential to dramatically affect the amount

of money participants are able to save for retirement. The Department of Labor has illustrated that a 1% difference in fees reduces the average worker's account balance by 28% after 35 years. Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for billion-dollar plans like the Plan, which pool the purchasing power of tens of thousands of participants and have the bargaining power to obtain the highest level of service at the lowest fees.

33. As relevant to this case, under the circumstances prevailing well prior to the Class Period, it was and is understood that it is in the best interest of plan participants to enable them to participate in the potential for market earnings sooner rather than later. That general understanding applies to both contributions from employees as well as the allocation of forfeited plan assets and employer contributions. Accordingly, participants are better off when their plan expenses are defrayed on an ongoing basis as the expenses are due and incurred. Thus, defraying plan expenses with forfeited plan assets as they occur is more beneficial to plan participants when evaluated solely in the interest of plan participants and for the exclusive purpose of providing benefits and defraying plan expenses.

## FIDUCIARY STANDARDS REQUIRED UNDER ERISA AND SECOND CIRCUIT LAW

34. ERISA imposes strict duties of loyalty and prudence upon fiduciaries of retirement plans, like the Plan, that are covered by ERISA. Defendants are required by ERISA to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; and (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity

and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(A), (B) (emphasis added).

35. ERISA's fiduciary duties are the "highest known to the law." *Donovan*, 680 F.2d at 272 n.8.

36. The duty of loyalty is "the most fundamental duty" of a fiduciary: the fiduciary "must display throughout the administration of the trust complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quoting G. Bogert & G. Bogert, Law of Trusts and Trustees § 543 (2d ed. 1993)). In this Circuit, fiduciaries' "decisions must be made with an eye single to the interests of the participants and beneficiaries," *Donovan*, 680 F.2d at 271, and where a fiduciary's decision benefits the plan sponsor, the fiduciary must first undertake a "careful and impartial investigation" to ensure the decision in fact serves participants. *Id.*; see also *Leigh v. Engle*, 727 F.2d 113, 125–26 (7th Cir. 1984) (conflicted fiduciaries must "engage in an intensive and scrupulous independent investigation of their options").

37. The duty of prudence imposed by 29 U.S.C. § 1104(a)(1) focuses on the thoroughness of a fiduciary's investigation before making a decision and asks "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular [decision]." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 107 (2d Cir. 2021). A fiduciary's decision-making process is evaluated based on "the circumstances then prevailing," i.e., the facts the fiduciaries knew at the time or should have known had they employed a prudent process. 29 U.S.C. § 1104(a)(1)(B).

38. "[A] claim for breach of the duty of prudence will survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably infer from what is alleged

that the process was flawed or that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *Sacerdote*, 9 F.4th at 108. "[W]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not . . . suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith." *Id.* at 111. ERISA plaintiffs "generally lack the inside information necessary to make out their claims in detail unless and until discovery commences," and "a claim under ERISA may withstand a motion to dismiss based on sufficient circumstantial factual allegations to support the claim, even if it lacks direct allegations of misconduct." *Id.* at 106–07.

39. Additionally, ERISA, 29 U.S.C. § 1104(a)(1)(D), requires plan fiduciaries to discharge their duties "in accordance with the documents and instruments governing the plan," but only "insofar" as those documents are "consistent with the provisions of this subchapter and subchapter III." 29 U.S.C. § 1104(a)(1)(D); *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014) (explaining that compliance with a plan document does not necessarily mean a fiduciary has discharged its duties with the prudence required under ERISA). That a plan permits a particular use of plan assets therefore does not answer whether a fiduciary's choice to make that use was prudent or loyal.

40. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for, among other things, knowingly participating in a breach by another fiduciary or enabling breaches by other fiduciaries.

41. Under ERISA, a person is a fiduciary to the extent he or she: (1) exercises any discretionary authority or control over management of the Plan or the management or disposition of its assets; (2) renders investment advice regarding Plan assets for a fee or other direct

compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

42. Accordingly, the Committee is a fiduciary because it is the Plan's Administrator (a named fiduciary), vested with authority to manage and administer the Plan, and because it exercised discretionary authority with respect to selecting and retaining the Plan's recordkeeper and with respect to the allocation of Plan forfeitures at issue here.

43. United Rentals is a named fiduciary under the Plan and is also a fiduciary because it held and exercised the discretion over Plan forfeitures conferred on "the Employer" by Plan § 9.1(d), and with respect to the appointment and monitoring of the Committee, because it appointed the Committee and retained responsibility for monitoring the Committee.

## FACTS APPLICABLE TO ALL COUNTS[3]

### A. The Plan

44. The Plan is a defined contribution plan pursuant to 29 U.S.C. §§ 1002(2)(A) and (34) and was created by United Rentals for the sole benefit of its eligible employees. The Plan was originally adopted by United Rentals, Inc. effective January 1, 1998; sponsorship of the Plan was transferred to United Rentals (North America), Inc. effective September 14, 2012; and the Plan was most recently amended and restated in its entirety effective January 1, 2016. Plan, Preamble.

45. Throughout the Class Period the Plan ranged from approximately 18,700 (2020) to 27,059 (2025) participants with account balances and had Plan assets from $1.58 billion (2020) to

[3] Unless otherwise specified, the facts specific to the Plan in this section are taken from: (1) documents provided by Defendants to Plaintiff's counsel in response to a request under 29 U.S.C. § 1024(b)(4), including the Plan document (amended and restated effective January 1, 2016) and Amendments; (2) Plaintiff's Plan documents; (3) the Plan's Form 5500s and audited financial statements filed by Defendants with the Department of Labor and publicly available through the DOL's website at https://www.efast.dol.gov/5500Search/; and (4) other publicly available information about the Plan.

$2.64 billion (2025). Throughout the Class Period the Plan has been larger than roughly 99.9% of all defined contribution plans by number of participants, and it falls within the largest size band (more than 15,000 participants) used by the industry surveys of recordkeeping fees discussed below.

**Table 1: Plan Demographics**[4]

| Year | Participants | Participant Rank | Assets | Asset Rank |
|---|---|---|---|---|
| 2019 | 19,247 | 99.93% | $1,340,260,212 | 99.89% |
| 2020 | 18,705 | 99.92% | $1,583,488,847 | 99.90% |
| 2021 | 20,741 | 99.93% | $1,862,122,295 | 99.91% |
| 2022 | 22,737 | 99.94% | $1,576,417,568 | 99.91% |
| 2023 | 25,690 | 99.95% | $1,944,148,336 | 99.92% |
| 2024 | 26,787 | 99.95% | $2,265,775,494 | 99.92% |
| 2025[5] | 27,059 | | $2,644,230,685 | |

46. In accordance with 29 U.S.C. § 1103(a), the assets of the Plan are held in a trust fund by Principal Trust Company (a trade name of Delaware Charter Guarantee & Trust Company) as directed trustee. The Trust Agreement provides that "[t]he corpus or income of the Trust Fund shall not be used for, or diverted to, purposes other than for the exclusive benefit of the Participants or their Beneficiaries." Trust Agreement § .02. The Plan likewise provides that no amendment "shall authorize or permit any part of the Fund to be used for or diverted to purposes other than for the exclusive benefit of the Participants . . . or cause or permit any portion of the Fund to revert to or become the property of the Employer." Plan § 12.1.

[4] All data sourced from the Plan's Form 5500s filed by Defendants with the Department of Labor, Line 6g / 6g(2) (participants with account balances at end of year) and Schedule H, Line 11 (net assets at end of year), publicly available through the DOL's website at https://www.efast.dol.gov/5500Search/. Participant and asset rank percentages reflect the Plan's size relative to all defined contribution plans filing a Form 5500 for the applicable year.
[5] Participant and asset rank for 2025 is not available yet.

47. As the employer and sponsor of the Plan (also known as the settlor as that meaning is understood from trust law and used by the DOL in guidance), United Rentals drafted and amended the Plan and intended it to comply with the requirements of ERISA and the Internal Revenue Code of 1986, as amended.

**B. Relevant Plan Terms**

**Eligibility**

48. In general, all employees of United Rentals and its participating affiliates are eligible to participate in the Plan upon satisfying the Plan's age and service requirements. Eligible employees are automatically enrolled in the Plan at a default deferral rate of 3% (increased to 4% effective January 1, 2023). Plan § 4.1(b); Amendment No. 2022-1 § III.

**United Rentals' Mandatory Safe Harbor Matching Contributions**

49. Throughout the Class Period, the Plan has been funded by a combination of elective deferrals by Plan participants and company contributions, each of which is deposited into the Plan's trust fund and allocated to individual participant accounts. Effective January 1, 2014, the Plan was amended "to become a 401(k) Safe Harbor Plan in accordance with Section 401(k)(13) of the Code." Plan, Preamble. As a safe harbor plan, the Plan requires United Rentals to make a fixed matching contribution to satisfy the Code's nondiscrimination requirements.

50. Relevant here, throughout the Class Period the terms of the Plan provided that "[f]or each pay period during the Plan Year . . . the Employer will make Employer Safe Harbor Matching Contributions in an amount equal to: (i) one hundred percent (100%) of the Participant's first one percent (1%) of Compensation contributed as 401(k) Contributions; and (ii) fifty percent (50%) of the Participant's next five percent (5%) of Compensation contributed as 401(k) Contributions." Plan § 4.3(a) (hereinafter, the "Safe Harbor Match"). The Plan further provides that "[t]he

Employer shall have the sole responsibility for making the contributions necessary to provide benefits under the Plan." Plan § 2.2(d).

51. The SPD likewise informs participants that, as a safe harbor 401(k) plan, "the Employer must make Employer Safe Harbor Matching Contributions on behalf of all eligible Participants." SPD at 24.

52. In other words, United Rentals is contractually required to make the Safe Harbor Match to the Plan each time United Rentals pays Plan participants through its payroll process. The Safe Harbor Match is not discretionary, and its amount does not depend on the availability of forfeitures.

53. United Rentals paid the Safe Harbor Match every year during the Class Period according to the fixed formula set forth in the Plan. United Rentals' total contributions to the Plan (net of forfeitures applied to reduce them) were $29,704,804 in 2020; $32,878,412 in 2021; $38,831,610 in 2022; $48,939,051 in 2023; $51,438,435 in 2024; and $55,674,505 in 2025.[6]

**Vesting and Forfeiture of the Safe Harbor Match**

54. Under the terms of the Plan, participants are immediately vested in their own contributions as well as any actual earnings thereon. Plan § 7.1. In contrast, participants are not vested at all in the Safe Harbor Match made by United Rentals, and any actual earnings thereon, until they have completed two Years of Credited Service, at which point they become 100% vested. Plan § 7.2(c).

55. To the extent a participant is not 100% vested upon termination of employment, the participant forfeits the value of United Rentals' contributions and any actual earnings thereon

---

[6] Form 5500, Schedule H, Line 2a(1)(A), Plan Years 2020–2025. Reported employer contributions are net of forfeitures applied to reduce them; the gross amount United Rentals was obligated to contribute under the Plan formula was correspondingly higher.

(hereafter "Forfeited Plan Assets" or "Forfeitures") in his or her account on the earlier of the date the participant takes a distribution of his or her vested interest in the Plan or the date the participant incurs five consecutive Breaks in Service. Plan § 9.1. Because United Rentals employs a large workforce with substantial turnover, and because the Plan imposes a two-year cliff vesting schedule on the Safe Harbor Match, the Plan generates millions of dollars of Forfeited Plan Assets every year.

**Application of Forfeitures**

56. During the Class Period through December 31, 2023, the Plan document addressed the use of Forfeited Plan Assets in two places. Section 5.2, titled "Allocation of Forfeitures," provided in its entirety: "Forfeitures, if any, may be used to pay the reasonable expenses of administering the Plan or to reduce future Employer contributions." Section 9.1(d), titled "Forfeitures," provided in relevant part: "Any forfeitures shall be used at the discretion of the Employer to pay administrative expenses of the Plan or to offset future Employer contributions to the Plan."

57. The Plan's audited financial statements, filed with the DOL as part of the Plan's Form 5500 each year, confirm that Forfeited Plan Assets "can be applied to either reduce future Company contributions or to pay for Plan administrative expenses."[7]

58. In other words, throughout the Class Period through December 31, 2023, the Plan gave Defendants two permissible uses for Forfeited Plan Assets—to defray the expenses of administering the Plan or to reduce United Rentals' contributions—and required Defendants to choose between them. Nothing in the Plan required that Forfeited Plan Assets be used to reduce

[7] United Rentals 401(k) Investment Plan, Form 5500 for Plan Years 2020–2025, Notes to Financial Statements, Note 1 ("Forfeitures").

United Rentals' contributions, and nothing in the Plan gave that use priority over defraying Plan expenses. By drafting the Plan with terms that gave Defendants discretion with respect to the use of Forfeited Plan Assets, United Rentals necessarily required Defendants to consider, each year, whether using Forfeited Plan Assets to offset the Safe Harbor Match or to defray Plan expenses was in the best interest of Plan participants.

59. On December 30, 2024, Craig Pintoff, Executive Vice President and Chief Administrative Officer of United Rentals, Inc., executed Amendment No. 2024-1 to the Plan. Article V of that amendment deleted the first sentence of Section 9.1(d) and replaced it with the following: "Any forfeitures shall first be used to offset future Employer contributions to the Plan (including Employer matching contributions). Any remaining forfeitures shall be used to pay the administrative expenses of the Plan." The amendment was made retroactively effective to January 1, 2024. Section 5.2 of the Plan was not amended and continues to provide that Forfeitures "may be used to pay the reasonable expenses of administering the Plan or to reduce future Employer contributions."

60. The SPD does not tell participants how Forfeited Plan Assets are used. It does not disclose that forfeited amounts are applied to relieve United Rentals of its obligation to fund the Safe Harbor Match, and it does not disclose that the same amounts could instead have been used to eliminate the fees deducted from participants' accounts. The SPD states only that participants who leave before vesting "may forfeit some or all of the amounts" in their Safe Harbor Match subaccount. SPD at 34, 42–43.

**Plan Administration and Expenses**

61. The Plan document provides that the expenses of administering the Plan are, in the first instance, United Rentals' to pay: "To the extent that any administrative expenses of the Plan

are not paid by the Employer, such expenses shall be paid from the Trust and shall be treated as an expense of the Trust." Plan § 4.9. Likewise, "[a]ll usual and reasonable expenses of the Retirement Committee may be paid in whole or in part by the Company, and any expenses not so paid shall be paid by the Trustee out of the assets of the Trust." Plan § 2.1.

62. Throughout the Class Period, United Rentals elected not to pay the Plan's recordkeeping and administrative expenses. As the Plan's audited financial statements disclose each year: "A portion of the Plan's administrative expenses, primarily comprised of audit and legal fees, are paid by the Company. All investment related expenses, and the balance of administrative expenses, are paid by the participants."[8]

63. Throughout the Class Period the Plan paid direct and/or indirect compensation to third-party service providers to provide services to the Plan. Hereafter the payment of Plan assets for services shall collectively be referred to as "Plan Expenses."[9] Based on United Rentals' disclosures to the DOL throughout the Class Period, the Plan paid Plan Expenses to several service providers, including Principal Life Insurance Company (recordkeeper and "contract administrator"), Fiduciary Investment Advisors, LLC and its successor Fiducient Advisors LLC (investment advisory), Americopy (participant communications), and Morningstar Investment Management LLC (managed account services), among others. For example, the Plan disclosed to

[8] Form 5500, Notes to Financial Statements, Note 1 ("Administrative Expenses"), Plan Years 2019–2024.

[9] The amount of Plan Expenses specifically identified in this Complaint may understate the actual Plan Expenses paid by Plan participants because the amounts do not include undisclosed indirect compensation paid by Plan participants, including revenue sharing, float, and other indirect compensation received by Principal.

the DOL that Principal Life Insurance Company received $1,638,876 in direct compensation from Plan assets in 2024.[10]

64. The Plan's total administrative expenses paid from Plan assets, as reported on Schedule H of the Plan's Form 5500, were $1,203,272 in 2020; $1,229,266 in 2021; $1,368,744 in 2022; $1,600,957 in 2023; $1,718,354 in 2024; and $1,564,532 in 2025—a total of $8,685,125.[11]

65. Throughout the Class Period, Principal Life Insurance Company ("Principal") served as the Plan's recordkeeper and contract administrator, and its affiliate Principal Trust Company served as the Plan's directed trustee. Principal Life Insurance Company and Principal Global Investors Trust Company also managed several of the Plan's investment options, including the Principal Stable Value Z Fund and the Principal Equity Income, MidCap S&P 400 Index, and SmallCap S&P 600 Index separate accounts, which together held between approximately $188 million and $259 million of Plan assets during the Class Period and generated additional investment management revenue for Principal.[12] Under the Trust Agreement, Principal Trust Company also retains as "additional compensation" all interest and fee credits ("float") earned on Plan contributions and distributions while they are held in Principal's custodial bank accounts. Trust Agreement § .07. This float is not allocated to the Plan, and its amount is not disclosed to participants.

---

[10] Form 5500, Schedule C, Part I, Plan Years 2020–2025.

[11] Form 5500, Schedule H, Line 2i (Administrative Expenses), Plan Years 2020–2025. These amounts consist principally of Principal's "contract administrator" fees reported on Schedule C, and exclude the audit and legal fees that the Plan's financial statements state are paid by United Rentals.

[12] Form 5500, Schedule D and Schedule H, Line 4i (Schedule of Assets Held), Plan Years 2020–2025. The Plan's financial statements identify Principal Life Insurance Company and Principal Global Investors Trust Company as parties in interest.

66. Defendants elected to use nontransparent structures to pay Plan Expenses. Neither the Plan document nor the SPD discloses the amount of Principal's recordkeeping compensation, the method by which it is calculated, or whether Principal receives revenue sharing or other indirect compensation from the Plan's investment options. The SPD's only fee disclosures are transaction-based fees for loans ($75), hardship withdrawals ($80), and qualified domestic relations orders ($350 plus $220 per hour). SPD at 48. Accordingly, most Plan Expenses are paid from the accounts of Plan participants without any transaction visible to participants that identifies the amount paid to Principal or the basis for that amount. The use of Plan assets to pay Plan Expenses reduces the value of individual participant accounts and deprives the Plan of funds that otherwise would have been earned on the amounts deducted.

## THE COMMITTEE'S IMPRUDENT CONDUCT WITH RESPECT TO RECORDKEEPING FEES

### A. The Committee Imprudently Caused the Plan to Pay Excessive and Unreasonable Recordkeeping and Administrative Fees

#### i. Limitations on Participants' Access to Fee Information

67. ERISA includes a required disclosure framework (i.e., Form 5500s) to ensure that retirement plan participants can hold plan fiduciaries accountable for fulfilling their duties required under ERISA because it recognizes that plan participants and beneficiaries will often not have access to details about the conduct of plan fiduciaries. Accordingly, to ensure participants can hold fiduciaries accountable, courts recognize that inferences may often be required from limited publicly available information. See *Sacerdote*, 9 F.4th at 106–07. Therefore, the information publicly available through Form 5500s must be sufficient to enable Plaintiff to allege fiduciary breaches or else the entire purpose of ERISA fails.

68. A plan's participants do not have access to the fee and service disclosures that service providers must furnish to plan fiduciaries under the DOL's regulation implementing Section 408(b)(2) of ERISA, 29 C.F.R. § 2550.408b-2(c), and the participant-level disclosures required by 29 C.F.R. § 2550.404a-5 do not enable participants to determine the recordkeeper's total compensation from all sources or whether the plan is paying above-market rates for its services. Nor do participants have access to documentation related to requests for proposal, requests for information, or Committee meeting minutes, all of which might provide insights into the prudence of the Committee's process. Plaintiff does not have access to that information, and for purposes of this Complaint has drawn reasonable inferences regarding the Committee's process from the Plan documents, the Plan's Form 5500s, the Form 5500s of other plans that use the same recordkeeper, industry surveys, and other authorities.

**ii. The Recordkeeping and Administrative Services Principal Provides to the Plan**

69. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper," which includes, among other services, maintaining participant accounts and plan records, processing contributions and transactions, communicating with participants, processing loans and distributions, and providing the technology platform through which participants direct their investments. Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as "RKA."

70. Throughout the Class Period, Principal Life Insurance Company served as the Plan's recordkeeper and contract administrator. The SPD tells participants that "[t]he Retirement Committee has engaged Principal Financial Group ('Principal') to assist with Plan operations, including the enrollment of new participants, participant selection of investment options, loans and

withdrawals and distributions." Participants enroll in the Plan, change their deferral elections, opt out of automatic escalation, designate beneficiaries, select and change their investment options, request rollovers, and request loans, hardship withdrawals, and distributions "by contacting Principal either online or via phone," and they view their accounts and receive quarterly statements through Principal's website, www.principal.com. Principal's affiliate, Principal Trust Company, serves as the Plan's directed trustee and custodian. Trust Agreement § .01.

71. Principal itself has described the services it provides to the Plan, in the Plan's Form 5500 Schedule C filed with the Department of Labor, in exactly the same way in every year from 2019 through 2025. Principal is identified as the Plan's "contract administrator," and its compensation is reported under Schedule C service codes 13 (Contract Administrator), 37 (Participant Loan Processing), 50 (Direct Payment from the Plan), and 64 (Recordkeeping Fees).[13] In each year Principal also disclosed that it received "eligible indirect compensation" in connection with its services to the Plan—compensation from sources other than the Plan or the Plan sponsor, such as revenue from investment products and float—for which it furnished the Plan the disclosures required by 29 C.F.R. § 2550.408b-2(c), rather than reporting a dollar amount.[14]

72. Nothing about the RKA services Principal provides to the Plan is exceptional, unusual, or customized. The Plan is a single-employer 401(k) plan with a safe harbor match, a standard menu of investment options, automatic enrollment, participant loans, and hardship withdrawals. Principal delivers its RKA services to the Plan through the same participant website,

---

[13] Form 5500, Schedule C, Part I, Line 2, Plan Years 2019–2025. The service codes are defined in the Department of Labor's Instructions for Form 5500, Schedule C. Codes 13 and 37 describe the nature of the services provided; codes 50 and 64 describe the manner in which Principal was compensated (direct payment from the Plan, characterized as recordkeeping fees).

[14] Form 5500, Schedule C, Part I, Line 1 and Line 2, elements (e)–(h), Plan Years 2019–2025.

call center, and administrative platform that it uses for its other large-plan clients, and, as shown below, it describes those services to the Department of Labor using the same service codes it uses for those other clients.

73. Principal also provides a small number of "a la carte" transaction services for which the Plan charges the individual participants who use them: a $75 fee for each loan, an $80 fee for each hardship withdrawal, and a $350 fee (plus $220 per hour) for processing a qualified domestic relations order. SPD at 48. To the extent those transaction fees are included in the direct compensation Principal reports on Schedule C, the same is true of each of the comparable plans identified below, all of which report Principal's compensation under the same code 37 for participant loan processing.

74. The Plan separately pays other service providers for services that are not part of Principal's RKA package—including Fiduciary Investment Advisors, LLC and its successor Fiducient Advisors LLC (investment advisory services to the Committee), Americopy (participant communications), and Morningstar Investment Management LLC (managed account services paid for by the participants who elect them).[15] The RKA fees analyzed in this Complaint are only the amounts paid to Principal.

**iii. Principal's Additional Revenue from the Plan**

75. In addition to its direct RKA fees, Principal and its affiliates earned substantial additional revenue from the Plan throughout the Class Period. Principal Trust Company served as the Plan's trustee. Principal Life Insurance Company and Principal Global Investors Trust Company managed several of the Plan's investment options, including the Principal Stable Value Z Fund and the Principal Equity Income, MidCap S&P 400 Index, and SmallCap S&P 600 Index

[15] Form 5500, Schedule C, Part I, Plan Years 2020–2025.

separate accounts, which together held between approximately $188 million and $259 million of Plan assets during the Class Period and generated investment management revenue for Principal.[16] Under the Trust Agreement, Principal Trust Company also retains as "additional compensation" all interest and fee credits ("float") earned on Plan contributions and distributions while they are held in Principal's custodial bank accounts. Trust Agreement § .07. This float is not allocated to the Plan, and its amount is not disclosed to participants.

76. It is well understood in the retirement plan industry, and was well understood throughout the Class Period, that recordkeepers will reduce their RKA fees for plans that use the recordkeeper's proprietary investment products, stable value fund, or trust services, because those arrangements provide the recordkeeper with incremental revenue from the same client. An August 2024 empirical study by CEM Benchmarking of the recordkeeping costs of 123 U.S. defined contribution plans found that plans whose investment lineups include the recordkeeper's own investment options pay recordkeeping costs approximately 18% lower than plans that do not, holding other factors constant.[17] A prudent fiduciary in the Committee's position would have used the Plan's stable value, separate account, trustee, and float arrangements with Principal as leverage to negotiate a discounted RKA fee. As shown below, the Plan received no such discount; it paid Principal more, not less, than plans that gave Principal nothing but the recordkeeping engagement.

[16] Form 5500, Schedule D and Schedule H, Line 4i (Schedule of Assets Held), Plan Years 2020–2025. The Plan's financial statements identify Principal Life Insurance Company and Principal Global Investors Trust Company as parties in interest.

[17] CEM Benchmarking, An Empirical Analysis of the Drivers of Recordkeeping Cost in U.S. Defined Contribution Plans, at 3, 7 (Aug. 2024).

**iv. The Standard of Care for Monitoring and Paying Only Reasonable RKA Fees**

77. A plan fiduciary has a "continuing duty to monitor" plan investments and service arrangements and to remove imprudent ones. *Tibble*, 575 U.S. at 529–30; *Hughes v. Northwestern Univ.*, 595 U.S. 170, 176 (2022). In the context of recordkeeping fees, "fiduciaries who fail to monitor the reasonableness of plan fees and fail to take action to mitigate excessive fees—such as by adjusting fee arrangements, soliciting bids, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means—may violate their duty of prudence." *Hughes v. Northwestern Univ.*, 63 F.4th 615, 625–26 (7th Cir. 2023). Courts in this District have held that a plaintiff plausibly alleges an imprudent recordkeeping arrangement by alleging that comparable plans paid significantly lower fees per participant for the same or similar services. See *Carrigan v. Xerox Corp.*, No. 3:21-cv-1085 (SVN), 2022 U.S. Dist. LEXIS 70428, at *19 (D. Conn. Apr. 18, 2022).

78. Well prior to the Class Period, the standard of care for negotiating and monitoring RKA fees was well established in the retirement plan industry based on DOL guidance, case law, and best practices shared by retirement plan professionals. That standard requires fiduciaries to understand the recordkeeper's total compensation from all sources; to benchmark and negotiate recordkeeping fees separately from investment fees and at regular intervals—Mercer, for example, advised plan sponsors in 2013 to "[b]enchmark and negotiate recordkeeping and trustee fees at least every other year"[18]; to monitor actual fees paid against contractual requirements; and to review services annually to identify opportunities to reduce administrative costs. Prudent plan fiduciaries also understand that ERISA's requirement to pay only reasonable fees is a market-

[18] Mercer LLC, DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance, at 3 (2013) ("By conducting a fee benchmarking study every other year, using market data specific to your plan, fiduciaries can document that the plan's fees are market competitive.").

based standard, and that the average or median fee paid by a group of plans is not necessarily a reasonable fee: if a number of similar plans are paying an above-market RKA fee rate, then the average of those plans will be above the reasonable market rate.

79. Accordingly, well prior to the Class Period prudent plan fiduciaries recognized that the only reliable way to ensure a plan was paying only reasonable RKA fees was to test the market at reasonable intervals—by soliciting competitive bids from other recordkeepers through a request for proposal ("RFP"), or at a minimum by requiring the incumbent recordkeeper to justify its fee against what it charges comparable clients for the same services—even where the fiduciaries have no intention of leaving their current recordkeeper. NEPC, one of the largest defined contribution plan consultants in the country, advises in each of its annual fee surveys that "[b]est practice is to compare fees and services through a record keeping vendor search Request for Proposal ('RFP') process."[19]

80. RKA services are priced per participant. The cost of providing them consists largely of fixed costs that are spread over the plan's participant base, so that, all else being equal, a plan with more participants can achieve a lower per participant RKA fee. The CEM study quantified this effect: when a plan's participant count doubles, its recordkeeping cost per participant falls by approximately 16%, and, after accounting for participant count, higher average account balances do not lower recordkeeping costs—because, as recordkeepers themselves report, their service levels are "balance agnostic."[20] Prudent fiduciaries therefore negotiate RKA fees as a fixed dollar

---

[19] NEPC, 2019 Defined Contribution Plan & Fee Survey, at 10; NEPC, 2020 Defined Contribution Plan & Fee Survey, at 12.

[20] CEM Benchmarking, An Empirical Analysis of the Drivers of Recordkeeping Cost in U.S. Defined Contribution Plans, at 3, 6–7 (Aug. 2024).

amount per participant, compare their plan's fee to what other plans of similar participant count pay for the same services, and expect the per participant fee to decline as the plan grows.

**v. The Plan's RKA Fees**

81. The Plan's per participant RKA fees[21] were as follows:

**Table 2: The Plan's RKA Fees**

| Year | Participants with Account Balances | Direct Compensation Paid to Principal | RKA Fee Per Participant |
|---|---|---|---|
| 2019 | 19,247 | $1,245,983 | $64.74 |
| 2020 | 18,705 | $1,128,059 | $60.31 |
| 2021 | 20,741 | $1,151,105 | $55.50 |
| 2022 | 22,737 | $1,280,315 | $56.31 |
| 2023 | 25,690 | $1,514,624 | $58.96 |
| 2024 | 26,787 | $1,638,876 | $61.18 |
| 2025 | 27,059 | $1,491,368 | $55.12 |

82. In direct compensation alone, Principal collected more than $8.2 million from the Plan between 2020 and 2025, in addition to the undisclosed float and investment management revenue described above. In seven years the Plan's per participant RKA fee never fell below $55, even as the Plan grew from 19,247 to 27,059 participants (an increase of more than 40%) and its assets nearly doubled, from $1.34 billion to $2.64 billion. Indeed, the fee rose in each year from 2021 through 2024—from $55.50 to $56.31, $58.96, and $61.18—while the Plan added more than 6,000 participants. A per participant fee that does not fall, and for four years rises, as a plan grows by 40% is the opposite of what occurs when fiduciaries monitor fees and leverage a plan's growing

[21] The amounts set forth in the table are the amount of disclosed direct compensation paid to Principal Life Insurance Company, as reported on Schedule C of the Plan's Form 5500, divided by the number of participants with account balances at each year end (Form 5500, Line 6g / 6g(2)). The amounts do not include any indirect compensation received by Principal, including float and revenue earned on Principal's proprietary investment products, and therefore understate Principal's total compensation.

size, and is itself a red flag that the Plan's recordkeeping arrangement was not being monitored or renegotiated.

**vi. Principal Charged Comparable Plans Substantially Less for the Same Services**

83. The most reliable benchmark for what the Plan should have paid Principal is what Principal itself charged other plans of similar size for the same services during the same years. Principal is one of the largest recordkeepers in the country, and dozens of large 401(k) plans use it as their recordkeeper. Using the Form 5500 filings that each of those plans files with the Department of Labor, Plaintiff identified 401(k) plans that (1) used Principal Life Insurance Company as their recordkeeper and contract administrator; (2) reported Principal's services and compensation on Schedule C under exactly the same four service codes—13, 37, 50, and 64—that the Plan reported for Principal, and no others; (3) reported, as the Plan did, that Principal received eligible indirect compensation for which the required disclosures were furnished; and (4) had between approximately 15,000 and 45,000 participants with account balances, the same size band as the Plan. The plans that satisfy each of those criteria for every year in which Principal served as their recordkeeper, and their RKA fees, are set forth in Table 3.[22]

[22] Plaintiff calculated the RKA fees of the comparable plans in exactly the same manner as the RKA fees of the Plan: disclosed direct compensation paid to Principal Life Insurance Company as reported on Schedule C, Part I, Line 2 of each plan's Form 5500, divided by the number of participants with account balances at the end of the plan year as reported on Line 6g / 6g(2) of the same Form 5500. Years in which a plan transitioned to Principal from a prior recordkeeper, and in which both recordkeepers were compensated, are omitted from Table 3 and are discussed separately below. The Darden Savings Plan operates on a fiscal year ending April 30; its figures are shown under the calendar year in which each fiscal year began. Fees for 2025 are shown for the plans whose 2025 Form 5500 had been filed as of the date of this Complaint.

**Table 3: Principal's RKA Fee Per Participant — the Plan vs. Comparable Principal-Recordkept Plans (Schedule C Codes 13, 37, 50, 64)**

| Plan (Sponsor) | Participants (2024) | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|
| United Rentals 401(k) Investment Plan | 26,787 | $55.50 | $56.31 | $58.96 | $61.18 | $55.12 |
| Darden Savings Plan (Darden Restaurants, Inc.) | 43,129 | $32.70 | $39.33 | $35.52 | $39.97 | — |
| Allegis Group, Inc. Retirement Savings Plan One | 41,539 | — | $37.59 | $45.03 | $40.72 | — |
| TCS 401(k) Plan (Tata America International Corp.) | 34,300 | — | $43.09 | $46.55 | $49.91 | — |
| ABB Inc. Retirement Savings Plan | 20,515 | $42.30 | $48.62 | $46.09 | $39.94 | — |
| Raymond James Financial, Inc. 401(k) Plan | 18,022 | $46.12 | $36.00 | $35.66 | $38.00 | $34.09 |
| Penske Automotive Group 401(k) Savings and Retirement Plan | 15,921 | $41.85 | $43.74 | $41.34 | $40.29 | $37.67 |
| Brookdale Senior Living Inc. 401(k) Retirement Savings Plan | 15,778 | — | $45.32 | $41.33 | $43.47 | — |
| Ross Stores, Inc. 401(k) Savings Plan | 15,631 | — | $41.64 | $42.75 | $42.18 | $39.58 |
| Comparable Plan Average | | $40.74 | $41.92 | $41.78 | $41.81 | $37.11 |
| Plan's Fee as % Above Comparable Plan Average | | 36% | 34% | 41% | 46% | 49% |

84. Table 3 permits a like-for-like comparison of the kind that a prudent fiduciary would have made and that a court can verify from the filings themselves. Every plan in the table bought the same package of RKA services from the same vendor; every plan reported those services under the same four Schedule C codes and no others; every plan, like the Plan, disclosed that Principal also received eligible indirect compensation; and every plan is within the same participant-count band as the Plan. The differences among the fees in Table 3 therefore cannot be attributed to differences in the identity of the recordkeeper, the services reported, the manner of

payment, or the size band of the plan. Plaintiff does not allege that the fees of the comparable plans were themselves the product of any particular fiduciary process; Plaintiff alleges that they establish the price at which Principal was willing to provide these services to plans like the Plan.

85. The comparison shows that the Plan paid Principal substantially more than every comparable plan in every year. In 31 comparable plan-years from 2021 through 2025, not one comparable plan paid Principal as much as the Plan paid in any year: the highest fee paid by any comparable plan in any year was $49.91 (TCS, 2024), and the lowest fee the Plan paid in any year was $55.12. Measured against the average of the comparable plans, the Plan paid 36% more in 2021, 34% more in 2022, 41% more in 2023, 46% more in 2024, and 49% more in 2025. Measured plan by plan over 2021 through 2024, the Plan paid on average 58% more than Darden, 51% more than Raymond James, 44% more than Allegis, 39% more than Penske Automotive and Ross, 36% more than Brookdale, 32% more than ABB, and 27% more than TCS, for the same services from the same vendor.

86. Plan size does not explain the difference. Darden (approximately 43,000 participants) and Allegis (approximately 41,500) are larger than the Plan and paid $33 to $45; ABB (approximately 20,500), Raymond James (approximately 18,000), Penske Automotive, Brookdale, and Ross (approximately 15,500 to 16,000 each) are smaller than the Plan and paid $34 to $49. Principal's price for this package of services to plans with 15,000 to 45,000 participants clustered around $40 per participant throughout the Class Period, regardless of where in that band the plan fell. The Plan is the outlier, within its own recordkeeper's book of business and at its own size.

87. Nor does the direction of the fees over time. From 2021 to 2024, while the Plan's fee rose from $55.50 to $61.18, Raymond James's fee fell from $46.12 to $38.00, ABB's from

$42.30 to $39.94, and Penske Automotive's from $41.85 to $40.29, and Darden's fee never exceeded $40. The comparable plans' fees behaved as RKA fees behave when fiduciaries are monitoring them; the Plan's fee behaved as an RKA fee behaves when no one is.

88. The experience of the comparable plans that changed recordkeepers during the Class Period confirms that the price of these services is set by negotiation, not by the content of the services. Several of the plans in Table 3 moved to Principal from Wells Fargo Bank, N.A. or Merrill Lynch in 2020 or 2021, and their per participant RKA fee fell substantially when they did: Penske Automotive paid Wells Fargo $57.73 per participant in 2019 and paid Principal $41.85 in 2021, its first full year with Principal; Brookdale paid Wells Fargo $54.05 in 2020 and paid Principal $45.32 in 2022; ABB paid Merrill Lynch $61.33 in 2020 and paid Principal $42.30 in 2021; and Allegis paid Wells Fargo $49.60 in 2020 and paid Principal $37.59 in 2022.[23] The fiduciaries of those plans, each of which was paying Principal-competitor pricing in the same range as the Plan, put the same package of services out to the market and obtained Principal's $40 pricing. The Committee, already a Principal client paying $55 to $61 for the same package, never did.

89. Principal's pricing for the largest plans it serves shows how far the price of the same services can move. Effective June 2021, Principal became the recordkeeper and trustee of the Lowe's 401(k) Plan, a plan with approximately 140,000 to 150,000 participants with account balances and $7.4 billion to $9.2 billion in assets, when Principal acquired Wells Fargo's institutional retirement and trust business. The Lowe's plan reports Principal's services and

[23] Form 5500, Schedule C, Part I, Line 2, and Line 6g / 6g(2), for the Penske Automotive Group 401(k) Savings and Retirement Plan (2019, 2021), the Brookdale Senior Living Inc. 401(k) Retirement Savings Plan (2020, 2022), the ABB Inc. Retirement Savings Plan (2020, 2021), and the Allegis Group, Inc. Retirement Savings Plan One (2020, 2022).

compensation under the same four Schedule C codes as the Plan—13, 37, 50, and 64—and, like the Plan, discloses that Principal received eligible indirect compensation. For those identical services, Principal received direct compensation of $8.81 per participant in 2022, $7.97 in 2023, $8.08 in 2024, and $18.27 in 2025.[24]

90. Plaintiff does not contend that the Plan, at one-fifth the size of the Lowe's plan, should have paid $8 per participant. Plaintiff alleges that the Lowe's pricing, together with Table 3, demonstrates that Principal's charge for this package of services is highly elastic and scales with the plan's participant count and bargaining leverage: approximately $8 to $18 for a plan of 140,000 participants, approximately $40 for plans of 15,000 to 45,000 participants, and—for the Plan alone—$55 to $61. A fiduciary that had asked Principal what it charged its other clients of similar size for the same services would have learned that the answer was roughly $40, and would have had every reason to demand, and every ability to obtain, that price or better for a plan that was also giving Principal its trustee business, its stable value assets, three proprietary separate accounts, and its float.

**vii. Industry Benchmarking Data Corroborate the Comparison**

91. Third-party benchmarking data, although they do not permit the service-by-service comparison that Table 3 permits, corroborate that the Plan's RKA fees were far above the market for plans of its size. Encore Fiduciary, a leading provider of fiduciary liability insurance to large retirement plans, tracked the recordkeeping fees of more than 2,500 plans with $100 million or more in assets for 2020, 2021, and 2022, counting revenue sharing as part of the fee. For plans

[24] Form 5500, Schedule C, Part I, Line 2, and Line 6g(2), for the Lowe's 401(k) Plan, Plan Years 2021–2025 (direct compensation to Principal Life Insurance Company of $1,320,447 (2022), $1,175,633 (2023), $1,136,347 (2024), and $2,577,315 (2025); participants with account balances of 149,935, 147,562, 140,573, and 141,036, respectively). In 2021, the year of the transition, the Lowe's plan paid Wells Fargo $620,029 and Principal $845,437, a combined $9.26 per participant.

with more than 15,000 participants, Encore reports a median fee of $32 (2020), $35 (2021), and $35 (2022) per participant, and a 90th percentile of $57, $57, and $53.[25] The Plan paid $60.31, $55.50, and $56.31 in those years—above Encore's 90th percentile in 2020 and 2022 and within two dollars of it in 2021. In other words, according to the recordkeeping industry's own insurer, roughly nine out of ten plans of the Plan's size paid less than the Plan.

92. NEPC's annual Defined Contribution Plan & Fee Surveys, which report combined recordkeeping, trust, and custody costs by participant count, are consistent. NEPC's 2019 and 2020 surveys (121 and 142 plans, respectively) report a 75th percentile of approximately $48 (2019) and $46 (2020) per participant for plans with more than 15,000 participants; NEPC's 2024 survey (278 plans) reports a 75th percentile of approximately $40 per participant for plans with 15,000 to 30,000 participants.[26] Because NEPC's figures include trustee and custody costs, and Principal's affiliate is the Plan's trustee, they are directly comparable to the fees the Plan paid Principal. The Plan paid $64.74 in 2019, $60.31 in 2020, and $61.18 in 2024—$15 to $21 per participant above NEPC's 75th percentile in each of those years.

93. CEM Benchmarking, which collects recordkeeping fees directly from plan sponsors, reports that the average recordkeeping fee among the 123 plans in its 2022 survey was

---

[25] Encore Fiduciary, 2020–2022 Recordkeeping & Benchmarking Database, at 7, 9, 11 (2020, 2021, and 2022 RK Fee By Plan Participant Size); Encore Fiduciary, Large Plan Recordkeeping Benchmark Study, at 5 (describing methodology). Encore publishes its data to defend plan sponsors against excessive fee claims and has no incentive to understate the fees that large plans pay; its data nonetheless support Plaintiff's allegations.

[26] NEPC, 2019 Defined Contribution Plan & Fee Survey, at 10; NEPC, 2020 Defined Contribution Plan & Fee Survey, at 12; NEPC, 2024 DC Plan Trends & Fees Report, at 17 (Mar. 2025). NEPC presents its results graphically; the figures stated are approximate readings of the 75th percentile of the plotted distribution.

$36.60 per participant, with the typical plan paying between $20 and $80.[27] The Plan's $56.31 fee in 2022 was more than 50% above that average, notwithstanding that the Plan had two of the characteristics CEM found to be associated with lower recordkeeping costs: a large participant count and the use of the recordkeeper's proprietary investment options.

**viii. The Inference of Imprudence and the Plan's Losses**

94. The facts alleged above—that Principal sold the identical package of services to eight comparable plans for approximately $40 per participant while charging the Plan $55 to $61; that the Plan's fee did not decline, and for four years rose, as the Plan grew by more than 40%; that plans that tested the market obtained Principal's $40 pricing while the Plan, an existing Principal client, did not; that the Plan received no discount for the trustee, stable value, separate account, and float business it gave Principal; and that the Plan's fee sat at or above the 90th percentile of the industry's own benchmarking data—support the reasonable inference that the Committee did not solicit competitive bids for the Plan's RKA services at any time during or immediately before the Class Period, did not benchmark Principal's compensation against what Principal charged comparable clients, did not leverage the Plan's size and its ancillary business with Principal, and did not employ any prudent process to ensure that the Plan paid only reasonable RKA fees. See *Sacerdote*, 9 F.4th at 108 (a prudence claim survives where the court "may reasonably infer from what is alleged that the process was flawed").

95. Had the Committee employed a prudent process, it would have obtained for the Plan, at a minimum, the price Principal was charging comparable plans for the same services—no more than $40 per participant—and, given the Plan's size and the additional revenue Principal

[27] CEM Benchmarking, An Empirical Analysis of the Drivers of Recordkeeping Cost in U.S. Defined Contribution Plans, at 3–4 (Aug. 2024).

earned from the Plan, very likely less. Using $40 per participant as a conservative measure of a reasonable RKA fee, the Plan overpaid Principal by $379,859 in 2020; $321,465 in 2021; $370,835 in 2022; $487,024 in 2023; $567,396 in 2024; and $409,008 in 2025—a total of $2,535,587 in direct fees alone, before accounting for the investment returns those amounts would have earned had they remained in participants' accounts, and before accounting for the indirect compensation Principal received from the Plan.[28] Because the Plan allocates RKA fees to participants' accounts, every Plan participant bore a share of that overpayment.

96. To be clear, Plaintiff does not allege that ERISA requires the Committee to scour the market to find the cheapest RKA fees. Instead, Plaintiff alleges that under the specific facts and context of this Plan the Plan's recordkeeping fees exceeded a prudent amount, and whether the amounts were actually imprudent is a question of fact that cannot be resolved on the pleadings. See *Sacerdote*, 9 F.4th at 108–09 (cautioning "against overreliance on . . . other ERISA cases as benchmarks" because "the assessment of any particular complaint is a context-specific task").

**DEFENDANTS' DISLOYAL AND IMPRUDENT ALLOCATION OF FORFEITED PLAN ASSETS**

**i. Defendants' Use of Forfeited Plan Assets During the Class Period**

97. The Plan's Form 5500s, including the audited financial statements attached to them, which are filed with the Department of Labor for each Plan year and publicly available, detail the amount of Forfeited Plan Assets generated each year, the use to which those Forfeited Plan Assets were put, and the amount of Plan Expenses paid from Plan assets.

---

[28] Overpayment is calculated as Principal's direct compensation for each year (Table 2) less $40 multiplied by the number of participants with account balances at year end. Plaintiff will establish the precise amount of the Plan's losses, including lost investment earnings, after discovery.

98. From 2020 through 2025, the Plan generated Forfeited Plan Assets in the following amounts: (1) in 2020, $1,766,796; (2) in 2021, $1,814,441; (3) in 2022, $1,589,724; (4) in 2023, $2,453,718; (5) in 2024, $3,626,910; and (6) in 2025, $3,121,156—a total of $14,372,745.[29]

99. From 2020 through 2025, Defendants decided to offset United Rentals' obligation to fund the Safe Harbor Match by allocating "substantially all" of those Forfeited Plan Assets to reduce United Rentals' contributions. As the Plan's audited financial statements state in identical language for every year of the Class Period: "During the year . . . substantially all forfeitures were used to reduce employer matching contributions."[30] These actions saved United Rentals the respective amounts, which flowed directly to its bottom-line profit.

100. From 2020 through 2025, Defendants caused Plan participants to pay Plan Expenses through deductions from their accounts and indirectly through revenue sharing or similar methods as described above. The minimum amounts paid by Plan participants either directly or indirectly are as follows: (1) in 2020, $1,203,272; (2) in 2021, $1,229,266; (3) in 2022, $1,368,744; (4) in 2023, $1,600,957; (5) in 2024, $1,718,354; and (6) in 2025, $1,564,532—a total of $8,685,125.[31]

101. From 2020 through 2025, Defendants did not disclose the use of a single dollar of Forfeited Plan Assets to offset Plan Expenses out of more than $14.3 million in Forfeited Plan Assets available for direction. In other words, throughout the Class Period Defendants used 0% of

---

[29] Form 5500, Notes to Financial Statements, Note 1 ("Forfeitures"), Plan Years 2020–2025 (reporting "[f]orfeitures of terminated participants' non-vested accounts, which aggregated" the stated amount for each year).

[30] *Id.*

[31] Form 5500, Schedule H, Line 2i, Plan Years 2020–2025. As the Plan's financial statements confirm, these are the administrative expenses "paid by the participants"; the audit and legal fees paid by United Rentals are not included.

the Forfeited Plan Assets available for direction to defray Plan Expenses. A prudent and loyal fiduciary presented with this scenario would not have applied millions of dollars to offset United Rentals' contributions while Plan participants shouldered millions of dollars in administrative expenses. These actions by Defendants, at a minimum, necessitate the inference that imprudence or disloyalty was at play in their decision-making process.

102. The following chart demonstrates Defendants' imprudent, disloyal, and conflicted use of forfeitures during the Class Period:

**Table 4: Plan Forfeitures vs. Plan Expenses Paid by Participants**

| Year | Forfeited Plan Assets Generated | Forfeitures Disclosed as Used to Offset United Rentals' Contributions | Forfeitures Disclosed as Used for Plan Expenses | Plan Expenses Paid by the Plan and Participants | Forfeitures Remaining After Paying All Plan Expenses |
|---|---|---|---|---|---|
| 2020 | $1,766,796 | Substantially all | $0 | $1,203,272 | $563,524 |
| 2021 | $1,814,441 | Substantially all | $0 | $1,229,266 | $585,175 |
| 2022 | $1,589,724 | Substantially all | $0 | $1,368,744 | $220,980 |
| 2023 | $2,453,718 | Substantially all | $0 | $1,600,957 | $852,761 |
| 2024 | $3,626,910 | Substantially all | $0 | $1,718,354 | $1,908,556 |
| 2025 | $3,121,156 | Substantially all | $0 | $1,564,532 | $1,556,624 |
| **Total** | **$14,372,745** | — | **$0** | **$8,685,125** | **$5,687,620** |

103. Forfeited Plan Assets exceeded the Plan Expenses charged to participants in every single year of the Class Period—by 47% in 2020, 48% in 2021, 16% in 2022, 53% in 2023, 111% in 2024, and 99% in 2025. Had Defendants used Forfeited Plan Assets to pay Plan Expenses, participants would have paid nothing for the administration of the Plan in any year of the Class Period, and more than $5.6 million of Forfeited Plan Assets would still have remained available to reduce United Rentals' contributions. Upon information and belief, Defendants have continued this practice to the present.

104. Defendants' practice is not the norm even among plans that use Principal as their recordkeeper. The audited financial statements of several of the comparable plans identified in Table 3 disclose that their fiduciaries used forfeitures to pay plan expenses during the same years: the Darden Savings Plan used $1,049,498 of forfeitures to pay administrative expenses in its 2024 plan year and $1,142,971 in its 2025 plan year, while also applying forfeitures to offset employer contributions; the Raymond James Financial 401(k) Plan used $291,659 of forfeitures to pay plan expenses in 2024; the Allegis Group Retirement Savings Plan One used $243,828 of forfeitures to reduce administrative expenses in 2024; and the Brookdale Senior Living 401(k) Plan used approximately $89,000 in 2024 and $47,000 in 2023.[32] Those plans operated under forfeiture provisions materially similar to Section 9.1(d) of the Plan, permitting forfeitures to be used either to pay plan expenses or to reduce employer contributions. Their fiduciaries exercised that discretion, at least in part, for the benefit of participants. Defendants never did.

**ii. Settlor Design Choices Versus Fiduciary Decisions About Forfeited Plan Assets**

105. When designing a defined contribution plan, an employer has a few limited options with respect to the treatment of forfeited plan assets. Employers that want all forfeited plan assets to be used first to reduce employer contributions prior to defraying plan expenses can draft the terms of the plan to explicitly require that, and during the Class Period several other large plan sponsors did so. On the opposite end of the spectrum, some plans preclude or limit forfeited plan

[32] Darden Savings Plan, Form 5500 for plan year ended April 30, 2025, Notes to Financial Statements (Forfeitures); Raymond James Financial, Inc. 401(k) Plan, Form 5500 for Plan Year 2024, Notes to Financial Statements, Note 1 (Forfeited Accounts); Allegis Group, Inc. Retirement Savings Plan One, Form 5500 for Plan Year 2024, Notes to Financial Statements (Forfeitures); Brookdale Senior Living Inc. 401(k) Retirement Savings Plan, Form 5500 for Plan Year 2024, Notes to Financial Statements, Note 1(c).

assets from being used to reduce employer contributions, or require that forfeited plan assets first be used to defray plan expenses.

106. In between these two poles are plans, like the Plan here through December 31, 2023, that accord discretion to their fiduciaries to use forfeited plan assets either to defray plan expenses or to offset employer contributions. In those instances, plan fiduciaries, as with any exercise of discretion over the use of plan assets, must use a prudent and loyal process to determine which of the allowable uses of forfeited plan assets would be consistent with their fiduciary duties. A plan fiduciary that exercises discretion to use forfeited plan assets to defray plan expenses is not providing a benefit greater than what was required or intended by the plan sponsor. Rather, plans that grant discretion to plan fiduciaries to choose among multiple different options for allocating forfeited plan assets, including to defray plan expenses, necessarily contemplate that plan expenses will be defrayed if doing so accords with ERISA's fiduciary standards.

107. Critically, when a plan sponsor makes the decision to bind itself to provide matching contributions, it is acting as a settlor and not in a fiduciary capacity with respect to the plan and is therefore free to prioritize its own interests over those of the plan and its participants. In contrast, a plan fiduciary making fiduciary decisions based on the discretion granted by the plan sponsor is explicitly prohibited by ERISA from considering the interest of the employer. Designing a plan's contribution or vesting formula is a settlor function; choosing, year after year, how to spend money already held in the Plan's trust is not.[33]

[33] It is worth noting that it is a settlor function to decide whether or not to provide a matching contribution (unconstrained by any fiduciary duties to plan participants) whereas decisions regarding the use of forfeited plan assets already held in the plan's trust are constrained by ERISA's fiduciary duties.

108. Here, United Rentals made the settlor decision to adopt a fixed Safe Harbor Match formula and a two-year cliff vesting schedule, without any reference to the amount of Forfeited Plan Assets. Once those settlor decisions were made, Defendants knew the exact amount of the Safe Harbor Match that United Rentals was obligated to contribute, and the only decision left to them—how to use the Forfeited Plan Assets already held in the Plan's trust—was a fiduciary decision to be made under the circumstances then prevailing, solely in the interest of participants. It is therefore irrelevant to Defendants' decision-making process that the adoption of the Safe Harbor Match was itself a settlor act.

109. There is no dispute that under the terms of the Plan in effect through December 31, 2023, defraying Plan Expenses was, at a minimum, an allowable use of Forfeited Plan Assets. Accordingly, throughout the entire Class Period, a prudent fiduciary as part of a prudent fiduciary process would have always, at a minimum, considered whether using Forfeited Plan Assets to defray Plan Expenses was more consistent with its duties under the Plan and ERISA than using Forfeited Plan Assets to offset the Safe Harbor Match. Because the terms of the Plan provided that the expenses of administering the Plan would be paid from the Trust only "[t]o the extent that any administrative expenses of the Plan are not paid by the Employer," Plan § 4.9, at least once a year a prudent plan fiduciary would have coordinated with United Rentals to determine how much, if any, of the Plan's administrative expenses United Rentals would pay, and would then have determined—for the exclusive purpose of providing benefits and defraying Plan expenses—how the remaining Plan Expenses would be paid. A prudent, independent, and non-conflicted plan fiduciary would have no reason to fail to use Forfeited Plan Assets to defray Plan Expenses when that was an allowable option under the terms of the Plan.

**iii. Defendants' Breaches of the Duty of Prudence**

110. ERISA's fiduciary duty of prudence is violated where, as here, Defendants, faced with a decision each year in choosing between allocating Forfeited Plan Assets toward offsetting the mandatory Safe Harbor Match or defraying Plan Expenses that would otherwise be borne by Plan participants, failed to conduct any investigation as to which choice would be in the best interest of the participants.

111. If Defendants had employed a prudent process every year immediately prior to and throughout the Class Period, Defendants would have used the Forfeited Plan Assets to defray all Plan Expenses.[34] In fact, however, Defendants did not allocate any Forfeited Plan Assets to defray Plan Expenses. Instead, after United Rentals bound itself, as settlor, to provide the Safe Harbor Match under a fixed formula, Defendants imprudently coordinated with United Rentals and the Plan's recordkeeper to calculate how much of the Forfeited Plan Assets would be used to offset the Safe Harbor Match, while still allowing Plan Expenses to be deducted from the accounts of Plan participants.

112. Because Defendants always had the ability to defray Plan Expenses with Forfeited Plan Assets but never did, it is reasonable to infer that Defendants employed a flawed decision-making process or did not employ any process at all to determine how to allocate Forfeited Plan Assets. The uniformity of the outcome—100% of forfeitures to United Rentals and 0% to

[34] In other words, to the extent that the Forfeited Plan Assets exceeded the foreseeable future ongoing Plan Expenses of the Plan as evaluated solely in the interest of Plan participants and for the exclusive purpose of providing benefits to participants and defraying the Plan Expenses of the Plan, then the remaining Forfeited Plan Assets could be used to offset United Rentals' Safe Harbor Match. Here, Forfeited Plan Assets exceeded Plan Expenses in every year of the Class Period. Defendants are solely in possession of the documents that would be necessary to review and evaluate that determination in detail.

participants' expenses, in every year, notwithstanding a growing surplus of forfeitures over expenses—is itself circumstantial evidence that no genuine, participant-focused process occurred.

113. Defendants did not, for example, investigate whether there was any set of circumstances that would support a decision to reduce the mandatory Safe Harbor Match prior to defraying Plan Expenses, and there are no facts or circumstances that could possibly make Defendants' failure to use Forfeited Plan Assets to defray Plan Expenses prudent.

114. First, there is no indication that using Forfeited Plan Assets to offset the Safe Harbor Match was necessary for United Rentals to maintain its past contribution levels. The Safe Harbor Match is a fixed formula applied every pay period under the terms of the Plan. Plan § 4.3(a). Every year throughout the Class Period, United Rentals' decisions related to the Safe Harbor Match were made without reference to the amount of Forfeited Plan Assets and were instead driven by the terms of the Plan, the requirements of Section 401(k)(13) of the Code, and the need to attract and retain talented employees. Companies like United Rentals use the amounts they have contributed as company contributions in prior years as part of their efforts to attract and retain employees in a competitive environment, and rarely reduce or eliminate contributions to their plans because doing so would put them at a substantial competitive disadvantage.

115. The Plan Expenses at issue are immaterial to both United Rentals' decision to provide the Safe Harbor Match and United Rentals' financial results. For example, in 2024 the amount of Plan Expenses that Defendants caused Plan participants to pay through deductions from their Plan accounts ($1,718,354) comprised approximately 3.3% of the $51.4 million United Rentals contributed to the Plan that year, and less than 0.07% of United Rentals' $2.58 billion in net income.

116. Second, there are no facts to suggest that United Rentals would be unable to meet its future Safe Harbor Match obligations, such that using Forfeited Plan Assets to offset the Safe Harbor Match was necessary, because if there were, United Rentals would have amended the Plan to eliminate or reduce the Safe Harbor Match. United Rentals had more than ample resources to fund the Safe Harbor Match without the subsidy. United Rentals, Inc.'s consolidated total revenues were $8.53 billion in 2020, $9.72 billion in 2021, $11.64 billion in 2022, $14.33 billion in 2023, $15.35 billion in 2024, and $16.09 billion in 2025, and its net income was $890 million, $1.39 billion, $2.11 billion, $2.42 billion, $2.58 billion, and $2.49 billion, respectively. In 2023 alone United Rentals generated $4.7 billion in cash from operations and returned more than $1.4 billion to shareholders through share repurchases and dividends. The Forfeited Plan Assets Defendants used to subsidize United Rentals' contributions—between $1.6 million and $3.6 million per year—were roughly two-tenths of one percent of United Rentals' net income or less in every year of the Class Period.

117. United Rentals was able to meet its contribution obligations throughout the Class Period and would have been able to meet its Safe Harbor Match obligation each year, even if no Forfeited Plan Assets were applied to offset its contributions. Indeed, United Rentals increased its total contributions to the Plan in every year of the Class Period, and effective January 1, 2023, it voluntarily enriched the Plan by raising the automatic enrollment deferral rate from 3% to 4%, raising the automatic escalation cap from 10% to 15%, and raising the cap on matching contributions for highly compensated employees from $3,000 to $4,000. Amendment No. 2022-1 §§ III, IV, VI. A company that was voluntarily expanding its Plan by tens of millions of dollars per year would not have reduced or eliminated its match over the $1.2 million to $1.7 million in annual expenses that Forfeited Plan Assets could have covered. And even if there were some

indication that United Rentals would be unable to meet future Safe Harbor Match obligations, a prudent fiduciary would only offset the amount necessary to prevent that result, and then allocate the remaining funds to other more beneficial options, like reducing Plan Expenses shouldered by the Plan participants.

118. Third, that the Internal Revenue Code and Treasury regulations permit qualified plans to use forfeitures to reduce employer contributions speaks only to plan qualification. It says nothing about whether a fiduciary's exercise of discretion among permitted uses complied with ERISA's duties of prudence and loyalty.

119. Consequently, an objective analysis of the available options throughout the Class Period, guided by ERISA's fiduciary duty of prudence, would indisputably not result in Defendants choosing to use all Forfeited Plan Assets available to offset the Safe Harbor Match year after year throughout the Class Period instead of using Forfeited Plan Assets to defray some or all Plan Expenses. Instead of acting prudently by using Forfeited Plan Assets to defray Plan Expenses charged to the individual accounts of Plan participants on an ongoing basis, Defendants chose to use all of the Forfeited Plan Assets for the purpose of offsetting United Rentals' Safe Harbor Match obligations to the Plan, thereby saving United Rentals millions of dollars at the expense of the Plan. Defendants' conduct, at the very least, necessitates the inference that either they did not have processes in place to weigh the benefits to participants of allocating Forfeited Plan Assets or, alternatively, the process employed was fatally flawed.

**iv. Defendants' Breaches of the Duty of Loyalty**

120. Throughout the Class Period loyal fiduciaries were required to make decisions with respect to the allocation of Forfeited Plan Assets "solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their

beneficiaries; and (ii) defraying reasonable expenses of administering the plan." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). As discussed above, Defendants did not use any Forfeited Plan Assets to reduce the Plan's Expenses, which would have benefited the Plan's participants rather than United Rentals.

121. Using Forfeited Plan Assets to reduce current and future employer contributions is always in the best interest of United Rentals because that option decreases United Rentals' own contribution costs and means that United Rentals does not need to take money out of its own general revenues to pay for its Safe Harbor Match obligations. Every dollar of Forfeited Plan Assets used to offset the Safe Harbor Match was a dollar United Rentals did not have to spend, and every such dollar flowed directly to United Rentals' bottom line.

122. There may possibly be a set of circumstances in which the option to reduce future employer contributions may be in the best interests of Plan participants when, e.g., there is a risk that the employer may be financially unable to satisfy its contribution obligations. In fact, however, in the event that a plan sponsor was in a questionable financial situation, in most cases the plan sponsor would simply exercise its settlor discretion to amend its plan document to eliminate any company contributions. And as described above, United Rentals was at all times abundantly able to fund its contributions. Absent a risk that United Rentals would be unable to satisfy its contribution obligations under the Plan, using Forfeited Plan Assets to defray Plan Expenses would be in the participants' best interest because that option would reduce or eliminate amounts otherwise charged to their accounts to cover such administrative expenses.

123. In deciding between using the Forfeited Plan Assets to benefit United Rentals or Plan participants, Defendants are presented with a conflict of interest in administering the Plan and managing and disposing of its assets. That conflict is acute here: the Plan expressly vested the

forfeiture decision in "the discretion of the Employer," Plan § 9.1(d), and the members of the Committee are employees of United Rentals who serve at its pleasure, may be removed by it without cause, and are indemnified by it. Plan §§ 2.1, 2.6, 2.8. Upon information and belief, Defendants took no steps to account for that conflict—they did not consult an independent fiduciary or advisor, did not investigate whether United Rentals could fund the Safe Harbor Match without the subsidy, and did not evaluate whether Forfeited Plan Assets could eliminate the expenses charged to participants and still offset a portion of United Rentals' contributions.

124. In using Forfeited Plan Assets to exclusively reduce United Rentals' Safe Harbor Match from 2020 through 2025, even though it was permitted to use those Forfeited Plan Assets to pay Plan Expenses for participants, Defendants were motivated solely by United Rentals' interest and breached their duty of loyalty. United Rentals, while acting in its fiduciary capacity with respect to the use of Forfeited Plan Assets, was motivated by its own settlor and employer self-interest in reducing its costs; the Committee, whose members were United Rentals' employees, acted to serve that same interest rather than the exclusive interest of participants.

125. To be clear, Plaintiff does not allege that ERISA prohibits fiduciaries from ever using Forfeited Plan Assets to offset company contributions, and does not allege that the discretion conferred by the Plan is itself a violation of ERISA. Rather, Plaintiff alleges that under the specific facts and context of this Plan—where Defendants were accorded discretion by the Plan over how to allocate Forfeited Plan Assets, where United Rentals' Safe Harbor Match was fixed and would have been paid regardless, where United Rentals was earning billions of dollars a year, where Forfeited Plan Assets exceeded Plan Expenses in every year, and where participants were being charged excessive RKA fees that Forfeited Plan Assets could have eliminated—a prudent and loyal fiduciary would not make the decisions that Defendants made (as alleged above). Here, under

the circumstances described, it is reasonable to infer that Defendants did not employ a prudent and loyal fiduciary decision-making process and thus breached their fiduciary duties of prudence and loyalty. See *Sacerdote*, 9 F.4th at 108–09.

**v. United Rentals' Retroactive December 2024 Amendment**

126. As alleged above, on December 30, 2024, United Rentals executed Amendment No. 2024-1, retroactive to January 1, 2024, replacing the first sentence of Section 9.1(d) to require that Forfeited Plan Assets "first be used to offset future Employer contributions to the Plan (including Employer matching contributions)." The amendment confirms three things. First, United Rentals understood that the pre-2024 Plan language authorized—and, read in light of ERISA's fiduciary duties, called for—the use of Forfeited Plan Assets to pay Plan Expenses; otherwise there would have been no reason to change it. Second, United Rentals understood that Defendants' practice was in tension with that language and sought to ratify the practice after the fact. Third, United Rentals adopted the amendment to protect its own financial interest in the midst of widespread litigation challenging precisely this practice, not to benefit participants.

127. The amendment does not cure Defendants' breaches. Section 5.2 of the Plan was left unchanged and continues to authorize the use of Forfeited Plan Assets to pay Plan Expenses. More fundamentally, ERISA requires fiduciaries to follow plan documents only "insofar as such documents and instruments are consistent with" ERISA. 29 U.S.C. § 1104(a)(1)(D). A plan provision cannot license a fiduciary to apply plan assets for the sponsor's benefit while participants bear the cost of administering the plan, and a retroactive amendment cannot convert a completed fiduciary breach into compliance. To the extent the amendment purports to require that result, it is unenforceable against the Plan and its participants, and Defendants' continued use of Forfeited

Plan Assets to reduce United Rentals' contributions on and after January 1, 2024 breached their duties of prudence and loyalty for the same reasons as their conduct before that date.

**vi. Losses to the Plan from the Misallocation of Forfeited Plan Assets**

128. Had Defendants used Forfeited Plan Assets to pay Plan Expenses, United Rentals would have made the same Safe Harbor Match from its own funds, the Plan's assets would have been greater by the amount of Plan Expenses charged to participants—$8,685,125 from 2020 through 2025, and additional amounts thereafter—and those amounts would have remained invested in participants' accounts, generating additional returns. The Plan's losses from Defendants' misuse of Forfeited Plan Assets therefore exceed $8.68 million before accounting for lost investment earnings, and will be proven with precision after discovery. Not because the Plan participants would receive an additional benefit, but because they would receive the full benefit they were entitled to under the Plan and ERISA for a defined contribution plan participant.

129. These losses are in addition to, and not duplicative of, the losses from excessive RKA fees alleged above. Had the Committee negotiated reasonable RKA fees and Defendants applied Forfeited Plan Assets to pay them, participants would have paid nothing for Plan administration and the Plan would have retained the difference.

130. Plan participants were not informed of the decision-making process that Defendants employed to assess how to apply Forfeited Plan Assets, and Plaintiff need not plead with more particularity regarding Defendants' decision-making process at this time. See *Sacerdote*, 9 F.4th at 106–07. Plaintiff does not have access to the Committee's minutes, United Rentals' directions to Principal regarding the forfeiture account, or any analysis Defendants performed regarding the use of Forfeited Plan Assets. Those materials are in Defendants' exclusive possession. Plaintiff's allegations regarding Defendants' process are based on the Plan's terms, the Plan's Form 5500

filings and audited financial statements, United Rentals' public financial disclosures, and the reasonable inferences drawn from Defendants' uniform, six-year course of conduct.

**TRANSACTIONS PROHIBITED BY ERISA**

131. In addition to ERISA's fiduciary duties, Congress enacted even more stringent additional safeguards to avoid transactions that are highly susceptible to abuse by ERISA fiduciaries. ERISA Section 406(a), 29 U.S.C. § 1106(a)(1), provides that a fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." ERISA Section 3(14) defines a party in interest to include "a person providing services to such plan," including the Plan's recordkeeper and trustee. 29 U.S.C. § 1002(14)(A)–(B); see *Cunningham*, 604 U.S. at 697.

132. The Supreme Court instructs that a plaintiff "need only allege the three elements within § 1106(a)(1)(C)," *Cunningham*, 604 U.S. at 702, and that plaintiffs "must plausibly allege that a plan fiduciary engaged in a transaction proscribed therein, no more, no less," *id.* at 709. "[S]imply alleging that a plan fiduciary engaged in a transaction" with a recordkeeping service provider is sufficient to state a claim, and "plaintiffs need do no more than plead a violation" of ERISA's prohibited transaction rules. *Id.* at 700. The statutory exemption for "reasonable compensation" for services, 29 U.S.C. § 1108(b)(2), is an affirmative defense that Defendants bear the burden of pleading and proving. *Id.* at 700–02.

133. From 2020 through 2025, the Committee caused, directed, and authorized tens of thousands of transactions, both directly and indirectly, extracting money from the accounts of Plan participants or reducing the net value of investment options held by participants in the Plan,

causing Plan participants to pay more than $8.2 million in direct compensation to Principal for RKA services, of which more than $2.5 million was excessive. The RKA fees were paid to parties in interest, i.e., Principal Life Insurance Company, the Plan's recordkeeper and contract administrator, and its affiliate Principal Trust Company, the Plan's trustee.

134. By allowing the Plan to be locked into an unreasonable recordkeeping fee arrangement with Principal, even though Principal's RKA fees were unreasonable for the services provided, the Committee caused the Plan to engage in transactions that it knew or should have known constituted a direct or indirect furnishing of services between the Plan and Principal prohibited by 29 U.S.C. § 1106(a)(1)(C), and a transfer of Plan assets to Principal prohibited by 29 U.S.C. § 1106(a)(1)(D). These transactions occurred each time the Plan paid fees to Principal in connection with the Plan's RKA services; each such payment was a separate transaction and a separate violation. Some of these transactions are memorialized in the statements received by each Plan participant, and others are memorialized in Plan-level accounting, e.g., the trust reports of the Plan. Throughout the Class Period, the Committee also directed and authorized Plan participants to pay an indeterminable amount of indirect compensation to Principal, including float and revenue on Principal's proprietary investment products, in connection with Principal's services to the Plan.

## CLASS ACTION ALLEGATIONS

135. ERISA authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a). See 29 U.S.C. § 1132(a)(2).

136. In acting in his representative capacity for the Plan, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representative of, the following class:

> All participants and beneficiaries of the United Rentals 401(k) Investment Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning October 15, 2020 and running through the date of judgment.

137. The class includes at least 27,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

138. There are questions of law and fact common to this class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as to the Plan and not as to any individual participant. Thus, common questions of law and fact include but are not limited to the following:

a. Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b. Whether the Committee breached its fiduciary duty of prudence by allowing the Plan to pay excessive and unreasonable RKA fees;

c. Whether the Committee caused the Plan to engage in prohibited transactions with Principal;

d. Whether Defendants breached their fiduciary duties of loyalty and prudence with respect to their management and allocation of Forfeited Plan Assets;

e. Whether United Rentals failed to adequately monitor the Committee;

f. What are the losses to the Plan resulting from each alleged breach of ERISA; and

g. What Plan-wide equitable and other relief the Court should impose to remedy Defendants' alleged breaches.

139. Plaintiff's claims are typical of the claims of the class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

140. Plaintiff will adequately represent the class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he was a participant in the Plan during the Class Period, has no interest that conflicts with the class, is committed to the vigorous representation of the class, and has

engaged experienced and competent lawyers to represent the class. Plaintiff's attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the class.

141. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants concerning their discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the class, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## COUNT I

### Breach of ERISA's Fiduciary Duty of Prudence Pursuant to 29 U.S.C. § 1104(a)(1)(B) with Respect to Excessive Recordkeeping Fees (Against the Committee)

142. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 139 of this Complaint as though fully set forth herein.

143. The Committee is a named fiduciary under the Plan and a functional fiduciary under 29 U.S.C. § 1002(21)(A) with respect to the selection, retention, and compensation of the Plan's recordkeeper.

144. The Committee's conduct, as set forth above, violates its fiduciary duty under Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B), in that the Committee failed and continues to fail to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

145. Based on the facts described above, throughout the Class Period, the Committee breached its fiduciary duty of prudence by allowing the Plan to pay excessive recordkeeping service fees to Principal; by failing to solicit competitive bids or otherwise benchmark Principal's total compensation at reasonable intervals; by failing to obtain for the Plan the pricing that Principal extended to comparable plans for the same services; by failing to leverage the Plan's size and its use of Principal's proprietary products and ancillary services to obtain reasonable RKA fees; and by permitting Principal—a party in interest that concurrently served as the Plan's recordkeeper, trustee, and investment manager—to set its own compensation without meaningful oversight, resulting in a loss to the Plan and the Plan participants.

146. Pursuant to Sections 409 and 502(a)(2) and (a)(3) of ERISA, 29 U.S.C. §§ 1109 and 1132(a)(2)–(3), the Committee is liable to restore to the Plan the losses that have been suffered as a direct result of its breaches of fiduciary duty and is liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

147. Plaintiff and the class have suffered losses as a direct result of the Committee's breaches of its fiduciary duty of prudence.

## COUNT II

### Party in Interest Prohibited Transactions Pursuant to 29 U.S.C. § 1106(a)(1)(C)–(D) with Respect to Recordkeeping Fees (Against the Committee)

148. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 147 of this Complaint as though fully set forth herein.

149. 29 U.S.C. § 1106(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest . . . or transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

150. Principal Life Insurance Company is a party in interest because it provides services to the Plan as the Plan's recordkeeper and contract administrator, 29 U.S.C. § 1002(14)(B), and Principal Trust Company is a party in interest because it is a fiduciary of and provides services to the Plan as its trustee, 29 U.S.C. § 1002(14)(A)–(B). See *Cunningham*, 604 U.S. at 697.

151. When the Committee elected to use Plan assets to pay Principal for recordkeeping services, it caused the Plan to engage in transactions which it knew or should have known constituted the furnishing of services between the Plan and a party in interest in violation of 29 U.S.C. § 1106(a)(1)(C), and engage in transactions which it knew or should have known constituted a transfer of Plan assets to, or use of Plan assets for the benefit of, a party in interest in violation of 29 U.S.C. § 1106(a)(1)(D).

152. The compensation Principal received was not reasonable, as alleged above, and the exemption in 29 U.S.C. § 1108(b)(2) is therefore unavailable. In any event, that exemption is an affirmative defense on which the Committee bears the burden of proof. *Cunningham*, 604 U.S. at 700–02.

153. Each payment to Principal during the Class Period was a separate prohibited transaction, and Plaintiff and the class lacked actual knowledge of the facts constituting these violations until shortly before this action was filed.

154. As a result of these prohibited transactions, the Committee is liable for all losses suffered by Plaintiff, class members, and the Plan under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), and is liable to restore to the Plan all profits obtained through the use of Plan assets and for such other equitable or remedial relief as the Court deems appropriate.

## COUNT III

**Breach of ERISA's Fiduciary Duty of Loyalty**
**Pursuant to 29 U.S.C. § 1104(a)(1)(A) with Respect to the Disloyal Allocation of Plan Forfeitures**
**(Against All Defendants)**

155. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 147 of this Complaint as though fully set forth herein.

156. Defendants were fiduciaries of the Plan with respect to the use of Forfeited Plan Assets. United Rentals held and exercised the discretion over Forfeited Plan Assets that the Plan vested in "the Employer," Plan § 9.1(d), and the Committee controlled the operation and administration of the Plan and the disbursement of the Fund, Plan §§ 2.2(b), 5.1(a), 11.1. 29 U.S.C. § 1002(21)(A). In making the annual decision as to how Forfeited Plan Assets already held in the Plan's trust would be used, each Defendant was acting in a fiduciary, not a settlor, capacity.

157. When exercising discretion and control over Forfeited Plan Assets and using them to reduce United Rentals' Safe Harbor Match, instead of defraying the reasonable costs of administering the Plan or allocating the Forfeited Plan Assets back to eligible Plan participants, Defendants considered the best interest of United Rentals as opposed to the best interest of participants, in violation of ERISA.

158. Defendants' decisions to use Forfeited Plan Assets to reduce United Rentals' Safe Harbor Match instead of defraying reasonable Plan Expenses as required by ERISA were motivated solely by and for the exclusive benefit of United Rentals, and Defendants took no steps to account for the conflict of interest inherent in that decision. United Rentals' December 30, 2024 amendment, adopted retroactively to entrench the practice in the face of litigation, confirms that self-interest motivated Defendants' conduct.

159. As a direct and proximate result of Defendants' fiduciary breaches described herein, the Plan and class suffered injury and loss for which Defendants are personally liable and are subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty of loyalty.

160. To the extent that either Defendant did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each Defendant is liable under 29 U.S.C. § 1105(a) because it was a co-fiduciary and knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of its specific responsibilities giving rise to its fiduciary status, and/or knowingly failed to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

161. Plaintiff and the class have suffered losses as a direct result of Defendants' breaches of their duty of loyalty.

## COUNT IV

**Breach of ERISA's Fiduciary Duty of Prudence**
**Pursuant to 29 U.S.C. § 1104(a)(1)(B) with Respect to the Imprudent Allocation of Plan Forfeitures**
**(Against All Defendants)**

162. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 147 of this Complaint as though fully set forth herein.

163. When exercising discretion and control over Forfeited Plan Assets and using them to reduce United Rentals' Safe Harbor Match, Defendants failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, when those aims are to act solely in the interest of the Plan participants and beneficiaries and for the exclusive purpose of providing benefits to Plan participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA.

164. When deciding how to allocate Forfeited Plan Assets, Defendants utilized an imprudent and flawed process, or no process at all. Despite the conflict of interest presented by alternatives under both ERISA and the Plan document, Defendants failed to undertake any reasoned and impartial decision-making process to determine whether using the Forfeited Plan Assets to reduce United Rentals' own contribution expenses, as opposed to paying Plan Expenses or for other purposes allowable under ERISA, was in the best interest of the Plan's participants or was prudent, and failed to solely consider which alternative would promote the exclusive purpose of providing benefits to Plan participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA.

165. By refusing to use Forfeited Plan Assets to eliminate Plan Expenses that were instead charged to participant accounts, and instead deciding to use these Plan assets to reduce

United Rentals' own contribution expenses, Defendants imprudently caused the value of the Plan's assets to decrease by causing Plan participants to incur expense deductions from their individual accounts that would otherwise have been covered in whole or in part by utilizing the Forfeited Plan Assets to pay Plan Expenses. Defendants continued this imprudent practice on and after January 1, 2024 in reliance on a retroactive amendment that cannot displace their duties under ERISA. 29 U.S.C. § 1104(a)(1)(D).

166. Had Defendants conformed with the minimum standard of care required under ERISA, Defendants would not have used Forfeited Plan Assets to reduce United Rentals' Safe Harbor Match without first using some or all of them to pay Plan Expenses. Alternatively, had Defendants conformed with the minimum standard of care required under ERISA, they would have used Forfeited Plan Assets to defray reasonable expenses of administering the Plan.

167. Plaintiff and the class have suffered losses as a direct result of Defendants' breaches of their duty of prudence. Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of its fiduciary duties alleged in this Count. Each Defendant is also subject to other equitable or remedial relief as appropriate.

168. To the extent that either Defendant did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each Defendant is liable under 29 U.S.C. § 1105(a) because it was a co-fiduciary and knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of its specific responsibilities giving rise to its fiduciary status, and/or knowingly failed to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

**COUNT V**

**Failure to Adequately Monitor Other Fiduciaries**
**(Against United Rentals)**

169. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 147 of this Complaint as though fully set forth herein.

170. Defendant United Rentals had the authority to appoint and remove the members of the Committee, and knew or should have known that the Committee had critical responsibilities for the Plan, including the selection and monitoring of the Plan's recordkeeper and its compensation and the allocation of Forfeited Plan Assets.

171. In light of this authority, Defendant United Rentals had a duty to monitor the Committee and its members to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties. Defendant United Rentals had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's RKA fees and Forfeited Plan Assets; and reported regularly to United Rentals.

172. The objectively imprudent, disloyal, and conflicted manner in which the Committee handled the Plan's RKA fees and Forfeited Plan Assets inferentially establishes that Defendant United Rentals breached its duty to monitor by, among other things:

a. Failing to monitor and evaluate the performance of the Committee with respect to the Plan's RKA fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonable RKA fees;

b. Failing to monitor the process by which the Plan's recordkeeper, Principal, was evaluated and failing to investigate the availability of more reasonably priced recordkeeping services—including from Principal itself—in a timely manner;

c. Failing to remove members of the Committee whose performance was inadequate in that they continued to pay the same RKA fees even though solicitation of competitive bids, or a comparison of Principal's fees to those it charged comparable plans, would have shown that maintaining Principal as the recordkeeper at the contracted price was imprudent and excessively costly, all to the detriment of the Plan and Plan participants' retirement savings;

d. Failing to monitor and evaluate the performance of the Committee with respect to Forfeited Plan Assets or have a system in place for doing so, standing idly by as the Plan misallocated Forfeited Plan Assets for United Rentals' benefit; and

e. Failing to remove members of the Committee whose performance was inadequate in that they continued to misallocate Forfeited Plan Assets for the benefit of United Rentals.

173. The unreasonably high annual costs of the Plan, when compared to substantially similar plans with the same or substantially similar RKA services, and the uniform application of Forfeited Plan Assets to United Rentals' benefit in every year of the Class Period, were—or should have been—red flags to United Rentals that the Committee was not fulfilling its duties.

174. As a consequence of the breaches of the duty to monitor with respect to the Plan's RKA fees and Forfeited Plan Assets, Plaintiff and participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendant United Rentals is liable to restore to the Plan all losses caused by its failure to adequately monitor the Committee and its members. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of the Plan and all similarly situated participants and beneficiaries, respectfully requests that the Court:

a. find and declare that Defendants breached their fiduciary duties and engaged in prohibited transactions as described above;

b. find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each violation of ERISA described above, and to otherwise restore the Plan to the position it would have occupied but for these violations;

c. order the disgorgement of all assets and profits secured by Defendants as a result of each violation of ERISA described above, including all amounts by which United Rentals benefited from the use of Forfeited Plan Assets to reduce its contribution obligations, together with lost investment earnings;

d. determine the method by which Plan losses under 29 U.S.C. § 1109 should be calculated;

e. order Defendants to provide all accounting necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a);

f. enjoin Defendants from using Forfeited Plan Assets to reduce United Rentals' contributions while the Plan's administrative expenses are charged to participants' accounts, and declare that any Plan provision purporting to require that result is unenforceable to the extent inconsistent with ERISA;

g. remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

h. surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA;

i. certify the class, appoint Plaintiff as class representative, and appoint Milberg, PLLC, Chirinos Law Firm PLLC, Stiegler Law Firm LLC, and Hayber, McKenna & Dinsmore, LLC as class counsel;

j. award to Plaintiff and the class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

k. order the payment of pre-judgment and post-judgment interest to the extent allowed by law; and

l. grant other equitable or remedial relief as the Court deems appropriate.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

October 20, 2026

Respectfully submitted,

Thomas J. Durkin, Esq. (ct30371)
**HAYBER MCKENNA & DINSMORE, LLC**
750 Main St., Suite 904
Hartford, CT 06103
Tel: (860) 522-8888
Email: tdurkin@hayberlawfirm.com

**MILBERG, PLLC**
Alexandr Rudenco*
800 S. Gay St., Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
arudenco@milberg.com

**CHIRINOS LAW FIRM PLLC**
Tulio D. Chirinos*
20283 State Road 7, Suite 592
Boca Raton, Florida 33498
Telephone: (561) 299-6334
tchirinos@chirinoslawfirm.com

**STIEGLER LAW FIRM LLC**
Charles J. Stiegler*
318 Harrison Ave., #104
New Orleans, La. 70124
Telephone: (504) 267-0777
charles@stieglerlawfirm.com

*Pro Hac Vice Application Forthcoming

Attorneys for Plaintiff and Proposed Class